Wanda Micks,

      Plaintiff,

v.

Gurstel Law Firm, P.C.,

      Defendant.

Case No. 17-cv-4659 (ECT/ECW)

**MEMORANDUM OPINION
AND ORDER**

Todd M. Murray, Friedman Iverson, PLLC, Minneapolis, MN, for Plaintiff Wanda Micks.

Andrew D. Parker, Parker Daniels Kibort LLC, Minneapolis, MN, for Defendant Gurstel Law Firm, P.C.

      Plaintiff Wanda Micks ("Micks") co-signed a student loan (the "Loan") for a friend in 2006, and she filed for Chapter 7 bankruptcy the following year. The parties dispute whether Micks's obligation under the Loan might have been among those debts discharged through her bankruptcy. Her friend later stopped making payments on the Loan, and in 2015, Defendant Gurstel Law Firm, P.C. ("Gurstel"), as counsel for the owner of the Loan, obtained a judgment against Micks and her friend in Hennepin County District Court for the unpaid balance. Soon after, Gurstel began garnishing Micks's wages to collect on that judgment. Micks, seeking relief from the garnishment, applied with the Hennepin County District Court to have the judgment against her vacated. Micks properly served Gurstel with her application to vacate the judgment. Gurstel received Micks's application but mistakenly failed to timely object to it. Having received no response from Gurstel, the state court vacated the judgment against Micks in July 2017. Gurstel was informed of the

state-court order vacating the judgment, but nonetheless continued garnishing Micks's wages to collect on the (now-vacated) judgment.

Micks filed this lawsuit. Her Amended Complaint alleges that Gurstel's actions violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and constituted the common-law tort of conversion. ECF No. 10. The parties have filed cross-motions for summary judgment. ECF Nos. 31, 36. Micks confirmed at the hearing that she was moving for summary judgment only as to liability on her FDCPA claim and not as to damages on that claim or on any aspect of her conversion claim. Gurstel represented at the hearing that it seeks summary judgment on all aspects of both of Micks's claims. Gurstel also has moved for sanctions against Micks and her counsel stemming from Micks's alleged abuse of the related state-court proceedings. ECF No. 55. Micks's summary-judgment motion will be granted because the law and the facts establish beyond reasonable dispute that Gurstel violated the FDCPA and that Gurstel's FDCPA violations did not result from a "bona fide error," as the FDCPA uses those terms. Gurstel's motions for summary judgment and sanctions will be denied.

I

A

The facts giving rise to this dispute begin long before the alleged FDCPA violations occurred. Micks[1] met Reginald Birts in 1998. Edwards Aff. Ex. B ("Micks Dep.") at 124 [ECF No. 34-1 at 16–175]. They met through Micks's work, and their children attended

---

[1]     Micks's surname was previously Harris, and various documents in the record therefore refer to her as Wanda Harris. For simplicity, the Court refers to her throughout this opinion as "Micks" regardless of the surname on the underlying document.

the same school. *Id.* at 125. The two were friends and would watch one another's children. *Id.* 124. Birts was the person who told her about Habitat for Humanity, the program through which Micks later acquired her home, and Birts even put "sweat equity" into the home to assist her in that process. *Id.* at 128–30. At some point Birts became interested in Micks romantically, but she did not reciprocate, so she ended the friendship. *Id.* at 126. They lost touch around 2000 or 2001. *Id.* at 125, 128–30.

Micks did not hear from Birts again until 2006, when he told Micks he wanted to go into politics and needed to seek more education to do that, and he asked her to co-sign a private student loan for $20,000. *Id.* at 126–27, 152–53. Micks agreed. *Id.* at 153–54. Birts used the money exclusively for his education and did not use any of the loan proceeds for a business or other commercial purpose. Birts Decl. ¶¶ 2–3 [ECF No. 44]. Micks received no part of the Loan proceeds herself. Micks Dep. at 158–59. She testified that she co-signed the Loan so that "we would have somebody else in politics" and that she "was co[-]signing for somebody that [she] wanted to see do better in his life." *Id.* at 159. Birts signed a "promissory note" agreeing to pay all principle and interest on the Loan, and not to "mess up" Micks's credit. *Id.* at 153.

B

In August 2007, Micks filed for Chapter 7 bankruptcy. *See generally In re Harris*, No. 07-42680 (NCD) (Bankr. D. Minn. 2007). Her bankruptcy petition listed the Loan, which had been originated by Charter One Bank. Decl. of Todd Murray ("Murray Decl.") Ex. 3 [ECF No. 40-1 at 22–56] at 16. Micks told her bankruptcy attorney that receiving a discharge of the Loan was particularly important to her. Murray Decl. Ex. 4 [ECF No. 40-

1 at 58]. The bankruptcy court granted her a discharge on November 14, 2007. Edwards Aff. Ex. E, Order Discharging Debtor, No. 07-42680 (NCD) (Bankr. D. Minn. Nov. 14, 2007) [ECF No. 34-1 at 112].

At that point, Micks understood that the Loan had been included in her discharge. Micks Dep. at 175. She cites a number of facts on which she based that understanding. First, the Loan was listed in her July 2007 bankruptcy petition, *see* Murray Decl. Ex. 3 at 16, and as her bankruptcy case proceeded she specifically expressed to her attorney the importance of having that specific Loan discharged, *see id.* Ex. 4 ("I wanted to know if you can make sure if they <u>can release me</u> on the attached student loan that I co-signed for? I won't be able to pay for this especially since I haven't even started paying for my own student loan." (emphasis in original)). Second, she received updates from her bankruptcy attorney as that proceeding unfolded, and she understood from her lawyer that, although other creditors had appeared in court, no one had appeared for the Loan creditors. Micks Dep. at 172. Third, she also understood from her bankruptcy attorney that in a "discussion with the legal team from the bankruptcy court . . . [t]hey were talking about the dismissal of the [L]oan." *Id.* at 173–74. As a result of those discussions, Micks understood, her bankruptcy attorney wrote a letter to the Loan creditor "saying that he was including it in the bankruptcy." *Id.* at 174. Fourth, correspondence from her bankruptcy attorney to the Loan creditor represented that because Micks was a "co-maker" on the loan and did not receive the loan funds herself, the debt was included in her discharge and further collection efforts on the Loan would be prohibited following discharge. *See* Murray Decl. Exs. 6 [ECF No. 40-1 at 63] and 7 [ECF No. 40-1 at 65–69].

Notwithstanding those facts, however, Micks's bankruptcy attorney, Gregory Wald, testified[2] that at no point did he advise Micks that the Loan would be discharged through her bankruptcy filing. Edwards Aff. Ex. D ("Wald Interrog. Dep.") [ECF No. 34-1 at 109–11] at Ans. to Interrog. No. 1. Specifically, Wald believes he advised Micks that "generally it is necessary to bring a lawsuit known as an 'adversary proceeding' in bankruptcy court to prove 'undue hardship' to discharge a student loan." *Id.* at Ans. to Interrog. No. 3. No evidence in the record before the Court suggests that Micks ever pursued an adversary proceeding with respect to her Loan debt. *See, e.g.*, Edwards Aff. Ex. C ("Wald Dep.") at 18 [ECF No. 34-1 at 87–08]. Wald further recalls advising her as follows:

> Before the bankruptcy petition was filed with the court, I believe that I told Wanda Micks that student loans are not ordinarily discharged in bankruptcy, but that a minority of courts had ruled that co-signed debts could be discharged without a finding of "undue hardship", and we could at least make an argument to the student loan lender that the debt should be considered discharged based on her co-debtor status. She could then make further decisions about the student loan after the student loan lender replied to our assertion of dischargeability.

Wald Interrog. Dep. at Ans. to Interrog. No. 2. He further advised her that only a minority of bankruptcy cases had ruled that co-signed student loans could be discharged in bankruptcy without a showing of undue hardship. *Id.* at Ans. to Interrog. No. 3. Wald did send a letter to the Loan creditor making that argument on Micks's behalf, but the Loan

---

[2]    After asserting attorney-client privilege in Gurstel's deposition of Wald, *see* Edwards Aff. Ex. C at 6–7, Micks evidently allowed Wald to be deposed on written questions pursuant to Fed. R. Civ. P. 31 after Magistrate Judge David T. Schultz advised during an informal discovery conference that she had arguably waived privilege with respect to what Wald told her about whether the Loan was discharged in bankruptcy. *See* Parker Aff. ¶¶ 2–4.

creditor did not respond. *Id.* Wald "did not tell her it was guaranteed or even likely that her student [loan] would be discharged based on her co-debtor status." *Id.*

## C

Birts stopped making payments on the Loan in April 2009, and in November 2009, the Loan was charged off. *See* Edwards Aff. Ex. R [ECF No. 34-1 at 173]. At that time, the Loan carried a balance of $31,195.53. *Id.*

In April 2013, the National Collegiate Student Loan Trust 2006-2 ("NCSLT"), which owned the debt on the Loan, filed suit against both Micks and Birts in Hennepin County District Court. *See* Edwards Aff. Ex. F, *National Collegiate Student Loan Trust 2006-2 v. Birts et al.*, No. 27-CV-14-9994 (Henn. Cty. Dist. Ct.) [ECF No. 34-1 at 113–18]. Gurstel represented NCSLT in that action. *Id.* at 115. Micks disputed the allegations in NCSLT's complaint by sending a letter to Gurstel in which she explained that she understood her obligation under the student loan to have been discharged in bankruptcy, but neither she nor Birts filed an answer in state court. Edwards Aff. Ex. G [ECF No. 34-1 at 119]; *id.* Ex. H ¶ 4 [ECF No. 34-1 at 120–23]. In July 2015, after neither Micks nor Birts appeared at trial, the state court entered judgment against both, in the amount of $36,921.37, including unpaid principal, interest, costs, and disbursements. Edwards Aff. Ex. H at 3 [ECF No. 34-1 at 122].

After obtaining the state-court judgment for its client, Gurstel began the process of attempting to collect on the judgment through garnishment. On three occasions—first in October 2015, then in July 2016, and again in May 2017—Gurstel sent Micks a

"Garnishment Exemption Notice And Notice Of Intent To Garnish Earnings."  Edwards

Aff. Ex. I [ECF No. 34-1 at 124–32].

D

As Gurstel pursued its garnishment of Micks's wages, Micks again sought counsel

from her bankruptcy attorney, Gregory Wald.  On September 9, 2016, Micks told him that

Gurstel was garnishing her wages in connection with "the Student Loan that I co-signed on

and that was eliminated in the 2007 Bankruptcy."  Edwards Aff. Ex. J at 4 [ECF No. 34-1

at 133–38].  Wald initially did not recognize Micks, whom he apparently had not advised

in almost nine years, and advised her to "contact the attorney that represented you in the

bankruptcy."  *Id.*  Micks told him that *he* was the attorney who had represented her in the

bankruptcy, and that she had "emphasize[d] the importance of this loan being discharged

too."  *Id.* at 3.  Wald explained over the course of several emails that "[s]tudent loan debt

is not automatically discharged in a bankruptcy case" and that although at the time Micks

received her discharge courts had split on whether co-signer liability on a student loan

could be eliminated without having to show undue hardship, the more recent trend within

the case law was that co-signers do need to show undue hardship.  *Id.* at 3–4.  Therefore,

Wald advised, "[w]hat we really need to talk about is whether it would be an 'undue

hardship' for you to repay this debt."  *Id.* at 3.  Micks continued to express confusion about

whether the Loan had been discharged.  *Id.* at 2.  Wald responded that to have obtained a

court's determination on the issue back in 2007, Micks would have had to initiate an

adversary proceeding against the lender and show either that repayment would present an

undue hardship or obtain a ruling that the loan was discharged on the basis of her co-debtor

7

status.  *Id.* at 1.  He further informed her that because the time period for an adversary proceeding does not expire, she could still initiate one.  *Id.*  The final email on that string, from Micks on September 12, 2016, again expresses her confusion about how, after receiving her discharge, she "still did not know if it was discharged or not.  And we still did not get an answer as to yeah or neah from the judge."  *Id.*  She closed that email by telling Wald, "I really needed this break that it seems . . . nobody knows if I really got in 2007."  *Id.*

Subsequent emails from Micks to Wald demonstrate her ongoing confusion: On September 27, 2016, she wrote, "The wording in the paperwork the courts sent to me said some student loans are not discharged.  Therefore some are indeed discharged.  It doesn't make sense that they are not specific."  Edwards Aff. Ex. K at 8 [ECF No. 34-1 at 139–47].  She told Wald she had talked with three different lawyers, all of whom advised her that Wald "should be able to help [her] reopen the discharged bankruptcy and have the judge rule on whether [her] student loans are discharged or not."  *Id.*  She told him, "I really did not understand if you explained [back in 2007] Greg," *id.* at 6, and that "I just want the Chapter 7 Bankruptcy you did for me enforced," Edwards Aff. Ex. L at 2 [ECF No. 34-1 at 148–54].

She and Wald discussed several possibilities for giving Micks some measure of protection from Gurstel's ongoing wage garnishment, including filing Chapter 13 bankruptcy or initiating an adversary proceeding.  Edwards Aff. Ex. K at 1–4.  In late January 2017, she told him she wanted to initiate an adversary proceeding and would try to come up with the $7,000 retainer Wald required.  *Id.* at 1–3.

By May 2017, Gurstel was still garnishing Micks's wages, and Micks had still not come up with the retainer for the adversary proceeding, so she asked Wald what she could do in the meantime. Edwards Aff. Ex. L at 1. Wald suggested calling Gurstel and making payment arrangements. *Id.* With respect to the adversary proceeding, he told her, "I don't know enough about your financial situation to know whether it makes sense to pay $7,000 and file a complaint for a hardship discharge" and suggested a meeting to assess the viability of that course of action. *Id.* On May 10, Micks suggested meeting sometime that week. *Id.* It is not clear whether they ever met for the consultation.

Micks repeatedly implied or expressly stated that she was unhappy with Wald's representation of her back in 2007, believing that he should have taken further steps at that time to ensure that no doubt remained about whether the Loan had been discharged. *E.g.*, Edwards Aff. Ex. L at 2, 8. Following her email exchanges with Wald, she "lost all faith" in him and "believed that [she] couldn't trust him anymore." Micks Decl. ¶ 4 [ECF No. 43]. She explained, "Based on what Mr. Wald told me during my 2007 bankruptcy, as well as the letters he wrote for me, I believed that the NCSLT student loan was discharged. Now, years later, he was telling me something completely different and suggesting that I pay him more money for more legal proceedings. . . . I couldn't understand why I had to pay him more money for something that I thought was already done." *Id.* ¶¶ 5–6.

"Because [she] was so frustrated" with Wald, Micks sought a second opinion at the Hennepin County Self-Help Center about what she needed to do to "stop the garnishment and uphold [her] bankruptcy discharge." *Id.* ¶ 7. There, she met with two unidentified

volunteer attorneys who, evidently based entirely on Micks's explanation of the situation, advised her that "Gurstel's garnishment was illegal" and that she needed to file an application in Hennepin County District Court to discharge the judgment Gurstel had obtained against her on behalf of NCSLT.[3]  *Id.* ¶ 8.

E

On June 30, 2017, Micks filed an application for discharge of judgment pursuant to Minn. Stat. § 548.181, seeking to discharge the judgment NCSLT had obtained against her. Edwards Aff. Ex. M [ECF No. 34-1 at 155–58].  It is in the months after Micks filed her application to discharge the judgment that the events giving rise to her FDCPA claim occurred.

Gurstel admits that it was served with the Application for Discharge of Judgment but states that it was "mishandled by Gurstel staff," and that as a result "the person who would normally have responded" to it "did not see it."  Gurstel SJ Br. at 8 [ECF No. 33] (citing Edwards Aff. Ex. O ¶ 11 [ECF No. 34-1 at 160–62]).  Accordingly, Gurstel did not timely object to Micks's Application for Discharge of Judgment.  *Id.*  Having received no objection, the Hennepin County District Court clerk granted the application, entering a Certification of Discharge of Judgment on July 21, 2017.  Edwards Aff. Ex. N [ECF No. 34-1 at 159].

---

[3]  Micks alleged in her Amended Complaint that she filed the application based on "the advice of her bankruptcy attorney that the student loan was discharged" and also on "advice from the Hennepin County Self-Help Center . . . that the default judgment could be discharged due to her bankruptcy."  Am. Compl. ¶¶ 17–18.

Gurstel did not receive any notice from the state court of the discharge of judgment. Edwards Aff. Ex. O ¶ 12. But ten days after the Certification of Discharge of Judgment was entered, on July 31, 2017, Micks's employer called Gurstel and spoke with an administrative assistant there. Second Edwards Aff. Ex. S ("Goltz Dep.") at 42–44 [ECF No. 48]. The administrative assistant's notes reflect that Micks's employer relayed to Gurstel that Micks had provided the employer with court documents relating to bankruptcy discharge and "court release." *Id.* at 44–46. There is no suggestion in Gurstel's file that the administrative assistant asked Micks's employer to provide it with a copy of those documents. *Id.* at 112. The administrative assistant appears to have instructed the employer to keep the wage garnishment in place until receiving further instructions from Gurstel. *Id.* at 46 (administrative assistant "[t]old the POE [Place Of Employment] to keep with the garn until she hears from us."). Gurstel's internal notes reflect that a Gurstel paralegal then checked PACER and added a notation to Micks's file: "NO BANKO [bankruptcy] this is a nondischargeable student loan debt." *Id.* at 47–48. Gurstel's corporate designee testified in her deposition that she understood that notation to mean that "this is a student loan debt and generally nondischargeable." Goltz Dep. at 48–49. Gurstel's corporate designee under Rule 30(b)(6) further testified that the paralegal "would have been trained to have entered that note in regard to student loan debt." *Id.* at 53–54. There is no record of the paralegal consulting with an attorney about whether the loan had in fact been discharged in bankruptcy, and neither she nor the administrative assistant escalated the call to a manager or an attorney to address the employer's apparent concern that, based on documents from a court indicating a bankruptcy discharge and a "court

release," garnishment may no longer be proper. *Id.* at 55–56. Per Gurstel's policy, such a call should have been escalated to a manager or an attorney. *Id.* at 55–56.

Gurstel issued a levy on Micks's wages on August 8, 2017. Murray Decl. Ex. 19 [ECF No. 40-1 at 125–32]. The notice of levy, which was sent to Micks's employer, asserted that the "unpaid judgment balance is $36,209.85" and attached a copy of the Writ of Execution issued by the Hennepin County District Court on April 20, 2017—three months before Micks had obtained an order discharging the judgment. *Id.* at 1–2, 7; Goltz Dep. at 58.

The next day, on August 9, 2017, Micks's employer again called Gurstel and spoke to a different administrative assistant, informing Gurstel that Micks had provided paperwork from a court stating that she is not supposed to be garnished. Goltz Dep. at 70–73. This assistant put the employer on hold and consulted with two other non-attorney colleagues before informing the employer that Gurstel "did not dismiss and that [the employer] would be receiving new WG [wage garnishment] soon." *Id.* at 74–76. There is no indication in the file that the administrative assistant who spoke with Micks's employer consulted with an attorney about that conversation, or that anyone asked the employer to provide a copy of the court documents it referenced in the call. Goltz Dep. at 77, 111–12.

Notwithstanding the two calls Gurstel had received from Micks's employer, Gurstel asserts that it "first learned of" the state court's discharge of judgment "after this action was filed on October 12, 2017," two-and-a-half months after Micks's employer first told Gurstel it had received documents from Micks relating to a bankruptcy release and court discharge of the debt. Gurstel SJ Br. at 9 (citing Edwards Aff. Exs. O ¶ 13, P, and Q). The

next day, Gurstel released the garnishment. Murray Decl. Ex. 21 [ECF No. 40-1 at 143–44].

F

In her FDCPA claim, Micks alleges that Gurstel violated four specific FDCPA prohibitions:

> (1) 15 U.S.C. § 1692e(2)(A), which prohibits debt collectors from falsely representing "the character, amount, or legal status of any debt" "in connection with the collection of any debt";
>
> (2) 15 U.S.C. § 1692e(5), which prohibits debt collectors from "threat[ening] to take any action that cannot legally be taken or that is not intended to be taken" "in connection with the collection of any debt";
>
> (3) 15 U.S.C. § 1692e(10), which prohibits debt collectors from "us[ing . . .] any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer" "in connection with the collection of any debt"; and
>
> (4) 15 U.S.C. § 1692f, which prohibits debt collectors from using "unfair or unconscionable means to collect or attempt to collect any debt."

*See* Am. Compl. Count I. Micks also brings a state-law claim for conversion. *See id.* Count II.

On December 21, 2017, as this case proceeded in federal court, Gurstel filed a motion in state court to vacate the order discharging the NCSLT judgment. Murray Decl. Ex. 23 [ECF No. 40-1 at 154]. The state court granted NCSLT's motion to vacate the discharge of judgment under Rule 60.02(a) of the Minnesota Rules of Civil Procedure, but denied its motion to reinstate the judgment, ruling (on a different record than has been

13

presented in this case) that Micks had not committed fraud, misrepresentation, or other misconduct and that "[b]ased on the record, the [state district court] cannot determine whether or not the debt at issue has in fact been discharged" although it was "likely" that it had not been. Edwards Aff. Ex. Q at 3, 6, 8 [ECF No. 34-1 at 165–72]. The state court determined that the issue of whether the debt had been discharged would have to be tried. *Id.* at 8. That case remains pending.

The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 to resolve the federal questions presented under Micks's federal FDCPA claim and supplemental jurisdiction over the conversion claim pursuant to 28 U.S.C. § 1367(a).

## II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255 (citation omitted).

## A

Gurstel moved for summary judgment on two grounds: first, that Micks is not covered by the FDCPA because the Loan does not satisfy the statutory definition of a "debt"; and second, that Micks's application to discharge the judgment against her

constituted a fraud on the state court and that she therefore should not be allowed to recover under the FDCPA. See Gurstel SJ Br. at 10–14.

1

Micks can prevail on her FDCPA claim only if Gurstel undertook its challenged activities in connection with an attempt to collect a "debt." *See generally* 15 U.S.C. §§ 1692e, 1692f. The FDCPA defines a "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5).

Gurstel argues that it was not collecting a "debt" as that term is defined by statute, and that Micks's FDCPA claim therefore fails. Specifically, it contends that because Micks and Birts were "mere acquaintances who had not seen nor spoken to one another for five years at the time Micks agreed to co-sign for Birts'[s] student loans," Gurstel SJ Br. at 13, Micks did not co-sign the loans "for personal, family, or household purposes," 15 U.S.C. § 1692a(5), and therefore she did not incur a "debt" that could be subject to the FDCPA's protections. As Gurstel characterizes it, "[t]he only potential benefit to Micks for her unaccountable decision to co-sign for Birts'[s] student loan was, in her words, that 'we would have somebody else in politics.'" Gurstel SJ Br. at 14 (quoting Micks Dep. at 159).

Micks makes two arguments in response. First, she argues that the operative issue under § 1692a(5) is what the money was used for, not the motivation for co-signing the Loan. Micks SJ Br. at 12–13 [ECF No. 39]. Second, she argues that even if her reason for

co-signing the Loan were relevant under § 1692a(5), that purpose was undisputedly purely personal. *Id.* at 13.

There is no dispute Birts used the Loan proceeds exclusively for education-related purposes. *See* Birts Decl. ¶¶ 2–3. There also is no dispute that, as a matter of law, education-related borrowing constitutes personal or household purposes. Courts nationwide agree on this point of law. *See, e.g., Smith v. Progressive Fin. Servs., Inc.*, No. 6:12-cv-1704-MC, 2013 WL 3995004, at *3 (D. Or. Aug. 1, 2013) (borrower's "student loan is 'debt' subject to the FDCPA") (citing *Brumberger v. Sallie Mae Servicing Corp.*, No. Civ. A. 02–2909, 2003 WL 1733548, at *3 (E.D. La. Mar. 28, 2003) (same); *Skerry v. Mass. Higher Educ. Assistance Corp.*, 73 F. Supp. 2d 47, 51 (D. Mass. 1999) (same); *Pelfrey v. Educ. Credit Mgmt. Corp.*, 71 F. Supp. 2d 1161, 1166 (N.D. Al. 1999) (same); *Carrigan v. Cent. Adjustment Bureau, Inc.*, 494 F. Supp. 824, 826 (N.D. Ga. 1980) (same)).

Gurstel's argument, then, rests on the implied premise that a single loan might constitute a "debt" under the FDCPA for a borrower, but not for a co-signer. Gurstel identifies no authority for giving a single loan multiple statuses under the FDCPA. To the contrary, "[t]he Act characterizes debts in terms of end uses." *Bloom v. I.C. Sys., Inc.*, 972 F.2d 1067, 1068 (9th Cir. 1992). In determining whether a particular loan constitutes a "debt," "courts typically 'examine the transaction as a whole,' paying particular attention to . . . whether [the] transaction was primarily consumer or commercial in nature.'" *Id.* (second alteration in original) (quoting *Tower v. Moss*, 625 F.2d 1161, 1166 (5th Cir. 1980) (applying the analogous Truth In Lending Act)). The Eighth Circuit has likewise held that

§ 1692a(5) "broadly defines debt as 'any obligation' to pay arising out of a consumer transaction." *Duffy v. Landberg*, 133 F.3d 1120, 1123 (8th Cir. 1998). It is irrelevant, for example, why a lender made a particular loan; what matters is how the loan proceeds were used. *Bloom*, 972 F.2d at 1068–69 (holding that a loan made to a friend for wholly personal reasons was not a "debt" as defined by the FDCPA because the borrower invested the borrowed funds as venture capital in a software company).

Even if the question of whether the Loan constitutes a debt as to Micks must be resolved separately from the question of whether it constitutes a debt as to Birts, there is no evidence to show that Micks co-signed the Loan for other than personal reasons: she wanted to help a former friend obtain an education so he could pursue his career aspirations. *See* Micks Dep. at 159. Gurstel cites no authority for the notion that such a purpose should be considered anything other than personal, or that the amount of time that had lapsed from when the two were last in contact until when Birts asked Micks to co-sign the Loan should negate the personal nature of their relationship. Her purpose in co-signing the Loan was not at all analogous to the other categories of transactions that courts routinely hold are excluded from the statutory definition of a debt, such as commercial or business-related transactions, *e.g.*, *Bloom*, 972 F.2d at 1069, or non-consensual obligations such as fines, *Graham v. ACS State & Local Sols., Inc.*, No. 06-cv-2708 (JNE/JJG), 2006 WL 2911780, at *2 (D. Minn. Oct. 10, 2006), unpaid child support, *Mabe v. G.C. Servs. Ltd. P'ship*, 32 F.3d 86, 88 (4th Cir. 1994), or civil liability, *Shorts v. Palmer*, 155 F.R.D. 172, 174–76 (S.D. Ohio 1994). There is no evidence showing that Micks undertook her obligations as co-signer under the Loan for commercial reasons. So far as all the evidence in the record

indicates, she co-signed the loan altruistically out of a desire "to see [a former friend] do better in his life." Micks Dep. at 159. That motivation, like the purpose for which that former friend ultimately used the Loan—was indisputably personal in nature. Accordingly, the Loan satisfies § 1692a(5)'s definition of a debt.

2

Gurstel next contends that Micks's application to discharge NCSLT's judgment constituted fraud on the state court and that the resulting discharge therefore should be treated as a legal nullity. Gurstel SJ Br. at 10–12. According to Gurstel, Micks knew, based on Wald's advice, that the Loan had not been discharged in her bankruptcy, and that the only way to discharge a Loan was to prevail in an adversary proceeding by showing undue hardship. *Id.* at 10–11. Micks never pursued, much less prevailed in, such an adversary proceeding, and in Gurstel's estimation it therefore was fraudulent for Micks to apply in state court for a discharge of NCSLT's judgment against her. *See id.* at 11. Because the only FDCPA violations Micks alleges relate to Gurstel's continued garnishment following the state-court's discharge of the judgment, Gurstel says, unwinding that state-court discharge likewise unwinds any basis Micks could possibly have for any FDCPA violation. *See id.*

"'[F]raud upon the court' exists when 'a court is misled as to material circumstances, or its process is abused, resulting in the rendition of a judgment which would not have been given if the whole conduct of the case had been fair," and where the misrepresentations are material and intentional. *In re C.M.A.*, 557 N.W.2d 353, 358 (Minn.

Ct. App. 1996) (quoting *Halloran v. Blue & White Liberty Cab Co.*, 92 N.W.2d 794, 798 (Minn. 1958) (citation omitted)).

Start by accepting for argument's sake that Micks's application to discharge the judgment was a "fraud upon the court" as defined by Minnesota law. Numerous courts—including the Eighth Circuit—have held that the FDCPA does not include a fraud exception. *Duffy*, 133 F.3d at 1124; *see also*, *e.g.*, *F.T.C. v. Check Inv'rs, Inc.*, 502 F.3d 159, 170 (3d Cir. 2007) *abrogated on other grounds by Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718 (2017); *Bass v. Stolpher, Kortizinsky, Brewster & Neider*, 111 F.3d 1322, 1329–30 (7th Cir. 1997); *Irwin v. Mascott*, 96 F. Supp. 2d 968, 975–76 (N.D. Cal. 1999). It is true, as Gurstel points out, that these rulings arose in circumstances of alleged fraud different from those presented by this case. Gurstel SJ Br. at 11–12. Generally speaking, the existence or non-existence of a fraud exception to the FDCPA has been litigated in contexts where the debt at issue resulted from the consumer having paid for a consumer purchase with a bad check. But the rationale of those cases, and the Eighth Circuit's *Duffy* decision in particular, lead here to the conclusion that, even if Micks acted fraudulently in asking the state court to discharge NCSLT's judgment, the FDCPA nevertheless provides her a civil remedy for debt-collection activities that violate the Act.

As the Eighth Circuit explained in *Duffy*, "courts generally will not create a fraud exception where none exists in the text of the statute." *Id.* at 1124 (citing *Bass*, 111 F.3d at 1329–30). "[T]he wrong occasioned by debtor fraud is more appropriately redressed under the statutory and common law remedies already in place, not by a judicially-created exception that selectively gives a green light to the very abuses proscribed by the Act." *Id.*

19

(alteration in original) (quoting *Bass*, 111 F.3d at 1330). The plain text of the FDCPA contains no fraud exception, and if Gurstel believes that Micks acted fraudulently in applying to have NCSLT's judgment discharged, Minnesota law provides remedies to address that alleged fraud. Gurstel could have filed objections to her application on behalf of NCSLT (which it did not do), and it can seek to have its judgment reinstated (which it currently is pursuing on NCSLT's behalf in Hennepin County District Court). Applying a fraud exception here would do what the Eighth Circuit held inappropriate in *Duffy*: giving a pass or "green light" to conduct the FDCPA forbids.

Even if a fraud exception existed under the FDCPA, the law and facts would not permit summary judgment in favor of Gurstel on this basis. A fraud-on-the-court claim requires an intentional misrepresentation. *In re C.M.A.*, 557 N.W.2d at 358. Here, by filing her application for discharge of judgment, Micks is said to have intentionally misrepresented to the state court that the Loan was discharged as part of her bankruptcy proceedings, and she is accused of intentionally pursuing a legal procedure she knew to be improper.

A reasonable jury could conclude that Micks believed the Loan had been, or at least may have been, discharged in her bankruptcy. Ample evidence exists in the record that Micks was genuinely confused about the effect of her bankruptcy discharge on her obligations under the Loan, at the beginning, middle, and end of her 2017 communications with her bankruptcy attorney. *See supra* Sec. I.D. Many areas of the law can be confusing to laypeople, and bankruptcy law in particular can be difficult, even for lawyers. Although nothing in Micks's communications with her bankruptcy attorney suggests that he gave her

anything but competent and professional counsel, a reasonable jury could conclude that Micks became distrustful of his advice, such that she simply did not believe her only option was to pay a second retainer to the lawyer she thought had settled the matter the first time around. *See* Micks Aff. ¶¶ 4–6. For these same reasons, a jury reasonably could find that Micks did not file her state-court application to discharge her obligations under the Loan knowing the procedure to be improper. Notably, although the state court granted NCSLT relief from the order vacating the judgment against Micks, it specifically declined to reinstate that judgment because, "[b]ased on the record, [it could] not determine whether or not the debt at issue has in fact been discharged." Edwards Aff. Ex. Q at 8.[4]

It also seems worth observing that, if Micks had intended to defraud the state court, she went about it in a way that was almost certain to result in immediate disclosure of her alleged fraud: she served Gurstel with her application. (Micks had nothing to do with Gurstel's failure to respond.) In that sense, the fraud on the court alleged to exist here

---

[4]     Gurstel disagrees with Micks's characterization of the state-court judgment Gurstel obtained on the loan as a default judgment, arguing that the state court "fully considered the merits of the parties' positions, and issued detailed findings of fact and conclusions of law in support of its order for judgment." Gurstel SJ Br. at 5 n.2. For purposes of this motion, it doesn't really matter one way or the other. But if Gurstel intends its characterization to suggest that Micks's attempts a few years later to discharge the judgment were deceitful or frivolous because the question had already been resolved in Gurstel's favor after fact finding in an adversary context, that would be incorrect. The state court's determination was a default judgment. That is, it was a judgment entered after Micks was served but failed to appear or otherwise defend. *See Default Judgment*, BLACK'S LAW DICTIONARY (10th ed. 2014). Default judgments commonly include certain factual findings based on allegations deemed admitted through default. Notably, in the subsequent state-court order granting NCSLT relief from the order vacating its judgment against Micks, the state court itself referred to the judgment NCSLT had obtained as a "default judgment." *See* Edwards Aff. Ex. Q at 7–8.

seems unique.  Most fraud-on-the-court cases involve allegations of concealment where, for example, one party accuses another of hiding or not disclosing evidence, and perhaps misrepresenting the nature of the undisclosed evidence.  So far as can be gleaned from the record, Micks is accused of concealing nothing.  Also, the state-court discharge of judgment did not result from anything Micks did following the filing of her Application.  Minnesota law required the state court to summarily discharge NCSLT's judgment against Micks when NCSLT failed to file any objection.  Minn. Stat. § 548.181, subd. 3.  Had NCSLT timely objected, the state court would have resolved Micks's application on its merits—as it is now endeavoring to do.  *Id.* at subd. 4.[5]

## B

Apart from its non-coverage and fraud-on-the-court arguments, Gurstel does not dispute that Micks has established a violation under each FDCPA provision she cites in her Amended Complaint.  To summarize, there appears to be no factual dispute that Gurstel garnished Micks's wages pursuant to a judgment that had been vacated and, in doing so, made certain statements about that judgment that were not true; similarly, there appears to be no dispute that the garnishment and the untrue statements constituted debt-collection practices prohibited under § 1692e and § 1692f of the FDCPA.  *See generally* Micks SJ Br. at 14–17 [ECF No. 38]; *see also* Murray Decl. Exs. 19–20 [ECF No. 40-1 at 124–41].

---

[5] Gurstel's sanctions motion is premised on the same argument it makes in support of its summary-judgment motion with respect to Micks's alleged fraud on the court.  For the same reasons Gurstel's fraud-on-the-court theory has been rejected, its sanctions motion will be denied.

The determination that Gurstel violated the FDCPA as alleged by Micks does not, however, establish Gurstel's liability as a matter of law. In its Answer to Micks's Amended Complaint, Gurstel asserted the FDCPA's "bona fide error" affirmative defense. Answer to Am. Compl. at 12 [ECF No. 12]. Gurstel contends that it has established the defense as a matter of law, entitling it to summary judgment. Alternatively, Gurstel contends that fact disputes concerning the defense preclude summary judgment for Micks. Micks argues that Gurstel is unable as a matter of law to establish the bona fide error defense. According to Micks, this means summary judgment should be entered in her favor, at least with respect to liability on her FDCPA claim.

Section 1692k(c) of the FDCPA provides that "[a] debt collector may not be held liable . . . if the debt collector shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). "The bona fide error defense exists as an exception to the strict liability imposed upon debt collectors by the FDCPA." *Picht v. Jon R. Hawks, Ltd.*, 236 F.3d 446, 451 (8th Cir. 2001). As a number of courts have observed, the exception is a narrow one. *See Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270-71 (11th Cir. 2011); *Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002, 1005 (9th Cir. 2008); *Eide v. Colltech, Inc.*, 987 F. Supp. 2d 951, 964 (D. Minn. 2013). An identified error must be "objectively bona fide," which the Eighth Circuit has clarified means "plausible and reasonable," and must have been "made despite the use of procedures reasonably adapted to prevent that specific error." *Wilhelm v. Credico, Inc.*, 519 F.3d 416, 420 (8th Cir. 2008) (citing *Johnson v. Riddle*, 443 F.3d 723, 728–30 (10th Cir. 2006)); *see*

*also Edwards v. Niagara Credit Sols., Inc.*, 584 F.3d 1350, 1353 (11th Cir. 2009) (defining a "bona fide error" as an error "made in good faith; a genuine mistake, as opposed to a contrived mistake" (quoting *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 538 (7th Cir. 2005)). Tying these elements to this case then, Gurstel must come forward with evidence showing that: (1) its FDCPA violations were not intentional; (2) it made an error, (3) the error was reasonable, (4) Gurstel maintained procedures reasonably adapted to prevent the error, and (5) the alleged FDCPA violations "resulted from" the identified error. A failure as to any one of these elements is dispositive.

Here, Gurstel's briefing addresses two errors—or perhaps sets of errors—that might form the basis for its bona fide error defense. First, Gurstel identifies its failure to follow its "policies and procedures governing the handling of bankruptcy mail, specifically including applications for discharge of judgment like the one filed by Micks with the state court" and says that its failure to follow these procedures led to its failure to object to Micks's application. Gurstel SJ Reply Br. at 11–12 [ECF No. 45]. Second, Gurstel addresses its handling of the two telephone calls from Micks's employer and the fact that it continued to believe after those calls that the state-court judgment against Micks remained valid when in fact it had been discharged. *Id.* at 12–14. Micks does not address the first error in her briefing, only the second. Micks SJ Br. at 17–21; Micks SJ Reply Br. at 5–7 [ECF No. 50].

1

Gurstel's first alleged error—in mishandling Micks's state-court application to vacate the judgment—seems to readily satisfy the second, third, and fourth elements of the

bona fide error defense.  Gurstel no doubt has identified evidence from which a reasonable juror could conclude it made an "error": it mishandled and thus did not respond to Micks's state-court application.  There is no evidence that the mistake was not made in good faith or was contrived.  This makes sense.  Gurstel had every reason to object to Micks's application.  But as sometimes happens, someone at Gurstel erred, and the application did not reach the individual responsible for coordinating Gurstel's response.  Gurstel also has cited record evidence showing that it maintained internal policies and procedures governing the handling of case-related mail.  *See* Gurstel SJ Reply at 11–12 (citing Second Edwards Aff. Ex. T (containing what appear to be excerpts from Gurstel's written procedures for certain bankruptcy files) and Goltz Dep. at 24).  Again, Micks disputes none of this.

The question of whether a reasonable juror could conclude that Gurstel's FDCPA violations "resulted from" its mishandling of Micks's application to vacate the judgment is more difficult.  Start with the law.  The FDCPA does not define the phrase "resulted from," 15 U.S.C. § 1692a, and—it seems—no case addresses this causation issue directly. *See, e.g., Wilhelm*, 519 F.3d at 421 (stating that the court "ha[d] no difficulty concluding" the FDCPA violation "was caused by a bona fide error" without analyzing the element of causation).  "Where there is no textual or contextual indication to the contrary, courts regularly read phrases like 'results from' to require but-for causality."  *Burrage v. United States*, 571 U.S. 204, 212 (2014).  This standard ordinarily requires a showing "'that the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct," or here, that the FDCPA violations would not have occurred in the absence of

defendant's identified error.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013) (quoting Restatement of Torts § 431, Comment *a* (negligence)).  "[A]n action 'is not regarded as a cause of an event if the particular event would have occurred without it.'" *Id.* (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 265 (5th ed. 1984)).  Questions of but-for causation can be difficult, and asking whether a particular event would have occurred without some preceding event can be taken to extremes.  But the Supreme Court in *Burrage* provided practical guidance and limiting principles:

> Th[e] but-for requirement is part of the common understanding of cause.  Consider a baseball game in which the visiting team's leadoff batter hits a home run in the top of the first inning.  If the visiting team goes on to win by a score of 1 to 0, every person competent in the English language and familiar with the American pastime would agree that the victory resulted from the home run.  This is so because it is natural to say that one event is the outcome or consequence of another when the former would not have occurred but for the latter.  It is beside the point that the victory also resulted from a host of *other* necessary causes, such as skillful pitching, the coach's decision to put the leadoff batter in the lineup, and the league's decision to schedule the game.  By contrast, it makes little sense to say that an event resulted from or was the outcome of some earlier action if the action merely played a nonessential contributing role in producing the event.  If the visiting team wound up winning 5 to 2 rather than 1 to 0, one would be surprised to read in the sports page that the victory resulted from the leadoff batter's early, non-dispositive home run.

571 U.S. at 211–12.

Concluding that Gurstel's FDCPA violations would not have occurred had it not mishandled Micks's state-court application to vacate the judgment requires accepting a series of inferences.  Gurstel advocates for this path in its reply brief when it says: "Had

Goltz received the Application, she would have consulted with Gurstel's client and objected to the Application." Gurstel SJ Reply Br. at 12. Gurstel seems to suggest that, if it had objected, then the judgment against Micks would have remained in effect, leaving Gurstel free to continue garnishing her wages and creating circumstances in which its FDCPA violations could not have occurred. To put it another way, Gurstel is saying that it would not have mistakenly believed that the state-court judgment remained valid after it had been discharged if the judgment hadn't been discharged in the first place.

Whether an objection would have prompted the state court to deny Micks's application is debatable. It certainly is true that an objection should have prevented an immediate entry of judgment discharging the Loan, but how the state court might ultimately have resolved any objection is not clear. These are roughly the same issues the state court is adjudicating now, and as mentioned earlier, although the state court granted NCSLT relief from the order vacating the judgment against Micks, it specifically declined to reinstate that judgment because, "[b]ased on the record, [it could not] determine whether or not the debt at issue has in fact been discharged." Edwards Aff. Ex. Q at 8. Predicting how a hypothetical state of affairs develops from that point requires conjecture.

More importantly, although Gurstel's mishandling of Micks's application certainly set up a state of affairs leading up to Gurstel's FDCPA violations (and beyond), it seems unreasonable to say that this error "resulted in" Gurstel's FDCPA violations. As a practical matter, this error and the violations are several steps removed from each other. The mishandling of Micks's state-court application was not itself an FDCPA violation. Neither was Gurstel's failure to object to Micks's application. The mishandling of Micks's

27

application did not make Gurstel's violations inevitable or even probable, at least insofar as the record shows. Other facts occurred in between—Gurstel not receiving the state-court order vacating the judgment, the telephone calls from Micks's employer, and Gurstel's responses to those calls—that are tied much more closely to Gurstel's FDCPA violations. Viewed in this light, Gurstel's mishandling of Micks's application is like the scheduling of the baseball game described in *Burrage*: just as scheduling the game set in motion events that made it possible for one team to win, the mishandling of Micks's application set up a state of affairs that made it possible for Gurstel to violate the FDCPA. In other words, because Gurstel's error merely played a nonessential contributing role in the violations' occurrence, it is not reasonable to say that Gurstel's FDCPA violations "resulted from" its error in mishandling its incoming mail. *See Burrage*, 571 U.S. at 212 ("[I]t makes little sense to say that an event resulted from or was the outcome of some earlier action if the action merely played a nonessential contributing role in producing the event.").

## 2

Now for the second error that Gurstel suggests could form the basis for its bona fide error defense: its handling of the two telephone calls from Micks's employer questioning the propriety of Gurstel's continued garnishment. Gurstel did not receive notice from the state court that the NCSLT judgment against Micks had been discharged. Micks SJ Brief at 18. But shortly after that state-court order was entered, Gurstel did receive two telephone calls from Micks's employer telling Gurstel that the employer had received information indicating that Micks's debt had been discharged. Micks SJ Br. at 18–19. The parties

dispute whether Gurstel's continued erroneous belief that the state-court judgment against Micks remained valid after it had been discharged resulted from a bona fide error in Gurstel's handling of the two telephone calls from Micks's employer. *See* Micks SJ Br. at 18–21; Gurstel SJ Reply Br. at 12–14.

There are two possible ways of characterizing Gurstel's mistaken belief that the state-court judgment against Micks remained valid after it received these telephone calls. One possibility is that it was primarily a mistake of law—that is, Gurstel believed, as it argues here in support of its summary-judgment motion, that any state-court order discharging the judgment against Micks was of no legal effect because of the circumstances under which it was obtained. *See* Gurstel SJ Reply Br. at 13–14 ("[C]ritically, the debt <u>had not been legally discharged</u>, because Micks had never filed an adversary proceeding under the Bankruptcy Code. . . . [T]he subject debt had not been discharged through appropriate legal means . . . [and Micks's employer's] phone calls do not change the fact that no legally-valid discharged of the underlying debt had occurred." (emphasis in original)). The other possibility is that it was primarily a mistake of fact—that is, Gurstel did not realize that the state court had issued an order vacating the judgment under which it was garnishing Micks's wages. *See id.* at 13 ("Gurstel had not received any written notification from the state court or anyone else that the debt had been discharged. . . ."). Whether it was a mistake of law or fact, this alleged error does not satisfy the bona fide error defense.

To the extent Gurstel made a mistake of law, such mistakes are not protected by the bona fide error defense. *Picht*, 236 F.3d at 451–52. Of note, the Supreme Court held in *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA* that the bona fide mistake

defense does not shield a debt collector from liability for violations committed as a result of the debt collector's misinterpretation of the FDCPA's requirements. 559 U.S. 573, 582–87 (2010). It is true that *Jerman* specifically declined to consider whether § 1692k(c)'s bona fide mistake defense applies "when a violation results from a debt collector's misinterpretation of the legal requirements of state law or federal law other than the FDCPA." *Id.* at 580 n.4. However, in declining to address that question, *Jerman* explicitly let stand the Eighth Circuit's ruling in *Picht v. Jon R. Hawks, Ltd.* that § 1692k(c) does not preclude FDCPA liability resulting from a creditor's mistaken legal interpretation of Minnesota's garnishment statute. *Id.* (citing *Picht*, 236 F.3d at 451–452). It is thus clear, at least within the Eighth Circuit, that a debt collector's mistake of law—whether as to the FDCPA or as to some other state or federal law implicated by its debt-collection activities—does not provide it safe harbor under § 1692k(c). *Picht*, 236 F.3d at 451–52 (citing *Hulshizer v. Global Credit Servs., Inc.*, 728 F.2d 1037, 1038 (8th Cir. 1984) (per curiam)).

To the extent Gurstel's mistake was one of fact, it has presented insufficient evidence from which a jury might reasonably conclude that the bona fide error defense applies. "To be considered a bona fide error, the debt collector's mistake must be objectively reasonable." *Edwards*, 584 F.3d at 1353 (citing *Johnson*, 443 F.3d at 729). As a matter of law, Gurstel's mistake of fact was not objectively reasonable given the information it received from Micks's employer. After being told on July 31 that Micks had provided the employer with documents from a court relating to bankruptcy discharge and court release, Gurstel's only investigation was for a paralegal to check PACER for any

relevant bankruptcy filings.  Goltz Dep. at 46–48.  After receiving a second call from the employer on August 9 stating that it had received paperwork from a court showing that Micks was not supposed to be garnished, Gurstel points to no evidence in the record that it conducted any factual investigation at all.  *See generally id.* at 70–76 (describing events relating to the employer's second call).  There is no evidence that anyone at Gurstel asked the employer for more information about the specific court documents it received from Micks or for a copy of the court documents themselves.  *Id.* at 111–12.  Similarly, Gurstel has not identified any evidence that anyone on its staff checked the state-court docket to confirm whether the judgment was still in effect.  Gurstel's own internal notes reflect that the calls it received specifically referenced that the employer's concerns about the propriety of the garnishment were based not merely on Micks's own representations but also on the employer's receipt and review of court documents relating to bankruptcy discharge, court release, and the fact that Micks was not supposed to be garnished.  Under those circumstances, it was not objectively reasonable for Gurstel to persist in its mistaken belief that the judgment remained valid.

*          *          *

Because the law and undisputed facts establish that Gurstel violated the FDCPA, and because the bona fide error defense is unavailable to Gurstel as a matter of law, Micks's motion for summary judgment will be granted and Gurstel's motion will be denied.

## C

No party's briefing addresses the law or facts that might be relevant to Micks's conversion claim.  *See* Am. Compl. at Count II.  At the hearing on the Parties' motions,

Micks clarified at that she does not seek summary judgment on that claim. Gurstel argued at the hearing that the conversion and FDCPA claims are sufficiently alike that, unless the Court ruled for Gurstel based solely on the FDCPA's definition of the word "debt," liability on the conversion claim survives or falls with liability on the FDCPA claim.

Gurstel has not shown that it is entitled to summary-judgment on the conversion claim. Either that claim overlaps with the FDCPA claim sufficiently, such that the denial of Gurstel's summary-judgment motion on the FDCPA claim necessarily requires a denial of summary judgment on the conversion claim, or the two claims differ enough that Micks will have to prove a somewhat different set of facts to prevail on each claim, in which case Gurstel did not carry its burden of showing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1. Defendant Gurstel Law Firm, P.C.'s motion for summary judgment [ECF No. 31] is **DENIED**;

2. Plaintiff Wanda Micks's motion for summary judgment [ECF No. 36] as to her FDCPA claim only, and only as to liability on that claim is **GRANTED**; and

3.      Defendant Gurstel Law Firm, P.C.'s motion for sanctions [ECF No. 55] is

**DENIED**.


Dated:  February 1, 2019            s/ Eric C. Tostrud
                                    Eric C. Tostrud
                                    United States District Court